Frank WILLIAMS, Plaintiff,

v.

TALLAHASSEE MOTORS,
INC., Defendant.

No. TCA 74–61.

United States District Court,
N. D. Florida,
Tallahassee Division.

May 13, 1976.

Order March 18, 1977.

Kent Spriggs, Tallahassee, Fla., for plaintiff.

W. Dexter Douglass, Tallahassee, Fla., for defendant.

## MEMORANDUM DECISION

STAFFORD, District Judge.

This is a civil rights action initiated pursuant to the provisions of 28 U.S.C. § 1343 and 42 U.S.C. § 2000e et seq. and § 1981. Plaintiff, a former black employee of Tallahassee Motors, Inc., alleges that he was involuntarily terminated in January, 1974 because of his race, and that his treatment was an integral part of a pattern and practice of discrimination against black persons in employment by the defendant. Suing individually and on behalf of others similarly situated, plaintiff seeks reinstatement with back pay, the institution of an affirmative action plan by defendant, and the award of a reasonable attorney's fee.

This matter first came on for hearing before the undersigned's predecessor in office, who filed on July 18, 1974, his order denying plaintiff's motion for preliminary injunction. The class subsequently was certified as consisting of all black applicants and employees of the defendant. Following denial of cross motions for summary judgment, the matter came on for non-jury trial on April 15, 1976. Having reviewed the in-court testimony, the interrogatories of parties, the transcript of the preliminary injunction hearing, and the extensive statistical data compiled by plaintiff, the court finds for defendant on both the individual and class action claims.

1. The plaintiff, Frank Williams, was employed as a new car salesman by defendant from September, 1973, until January, 1974. He was then the only full-time black salesman at Tallahassee Motors.

2. According to Mr. Williams, he was singled out for discriminatory treatment in several respects. Mr. Williams claims he was assigned a Courier truck as a demonstrator vehicle when less senior white salesmen were given more preferable vehicles. Similarly, white employees received business cards before Mr. Williams did. Mr. Williams' $75 weekly "draw", the amount salesmen withdraw in anticipation of commission sales, was also alleged to be less than the draw of white salesmen. Finally, plaintiff claims he was excluded from a breakfast sales meeting in Panama City which other salesmen were permitted to attend but which he was not apprised of.

3. Williams' immediate supervisor at the time these alleged incidents of discrimination occurred was one Carey "Zane" Gray. The record supports the inference of animosity on the part of Mr. Gray against Mr.

Williams, which may in part have been racially motivated. However, the incidents of discrimination cited by plaintiff are largely without merit. Thus, the evidence points to the fact that Mr. Williams was assigned a Courier truck because that was the "slow-moving vehicle" requiring maximum sales exposure at the time. Mr. Williams was in fact given a Mustang demonstrator vehicle to drive a few weeks later. Similarly, the "draw" incident is insignificant since it did not affect the total amount of pay that plaintiff received. The draw represented simply an advance against salary, which turned ultimately upon the amount plaintiff would earn in sales commissions. As to the breakfast sales meeting incident, the record shows that plaintiff was not present in the show room when announcement of the out-of-town breakfast sales meeting was made. Some white salesmen also failed to attend this particular meeting, and plaintiff in fact was afforded a competitive edge in that he was able to show cars to more prospective customers than would be the case if other salesmen were present. Plaintiff neither alleged nor proved that he was excluded from the weekly Monday morning sales meetings customarily attended by all salesmen.

4. Plaintiff's only other witness at trial, one Mr. William H. Lee, testified that E. W. Richardson, Jr., a vice president and co-owner of Tallahassee Motors, once fired a white employee because of the employee's liaison with a black woman; Lee also testified that Richardson had a policy of not recruiting blacks. These allegations were denied by Mr. Richardson, whose testimony the court found to be more credible than Lee's.

5. With respect to the reasons for plaintiff's termination, testimony of several defense witnesses was to the effect that Mr. Williams was a victim of slumping sales resulting from the Arab oil embargo and the nationwide energy crisis. Thus, Mr. James Rozar, a salesman at Tallahassee Motors for 28 years, testified that all salesmen were having trouble selling cars in late 1973-early 1974. Rozar testified that Williams was having particular problems selling cars due to his inexperience. Rozar further testified that the salesmen who did not make or who were very close to their "draw" ordinarily were phased out. Mr. Frank Shaw, Jr., vice president and co-owner of Tallahassee Motors, as well as the individual primarily responsible for hiring Mr. Williams, corroborated that Williams was laid off (along with three white salesmen) due primarily to slumping sales.

6. The record reflects that plaintiff was terminated in January, 1974 shortly after returning from a three-week honeymoon. Plaintiff himself was uncertain whether he had secured permission to be absent from work for the full three weeks. In any event, shortly after returning to Tallahassee Motors he was laid off. Thereafter, plaintiff was denied unemployment benefits because records from Tallahassee Motors filed with California unemployment authorities indicated that he had been terminated for cause. Mr. Williams' immediate supervisor, sales manager Zane Gray, was apparently responsible for this misinformation. When plaintiff brought the matter to Mr. Richardson's attention, Richardson wrote a letter to the appropriate authorities clarifying the record.

7. With respect to the class, plaintiff presents evidence that 26% of the population in metropolitan Tallahassee is comprised of Negroes and other races, although only 13.6% of the employees working for defendant on June 27, 1974, were black. This percentage was comprised of 12 individuals, of whom one was a new car salesman, one a painter, one a painter's helper, one a janitor, one a maintenance supervisor, and seven were porters. Plaintiff placed particular emphasis on the preponderance of blacks in the lower-paying menial jobs. However, this evidence must be weighed against testimony by Col. William E. Jenkins, a black official at Florida A & M University and owner of a Firestone service station in Tallahassee, to the effect that he had had difficulty in recruiting qualified black employees for his business. Col. Jenkins testified, for example, that while he had hired five black mechanics in the past,

all three of his present mechanics were white.

8. Particularly impressive was testimony of one Early Harris, Jr. Mr. Harris, a black, was a part-time salesman at Tallahassee Motors in the latter part of 1973 before this suit was initiated; he commenced full time employment in March, 1974. Mr. Harris, who was recruited by Zane Gray, stated that he personally had encountered no discrimination and had witnessed no discrimination against other black employees at Tallahassee Motors because of race. Buttressing this testimony was that of co-owners Shaw and Richardson, both of whom denied the pattern and practice of racial discrimination at Tallahassee Motors alleged by plaintiff. On the contrary, the evidence shows that Mr. Williams was hired in a conscious effort to increase the number of black employees at Tallahassee Motors and, more pragmatically, to tap the black car-buying market in the Tallahassee area.

### CONCLUSIONS OF LAW

1. This court has jurisdiction over the parties and the subject matter of this action.

2. The record supports the inference that Frank Williams, as the first full-time black new car salesman at Tallahassee Motors, encountered certain personal difficulties which he put down to racial discrimination. The court also finds that the letter indicating Mr. Williams' termination "for cause" was unjustified. However, plaintiff was not denied equal pay because of his race, nor was he laid off for that reason. Plaintiff's personal difficulties with his immediate supervisor do not reflect a managerial policy at Tallahassee Motors and do not rise to the level of a Title VII action.

3. With respect to the class action allegations, plaintiff's statistical case is not so strong as that of other statistical cases treated by the 5th Circuit. See e. g., *Rodriguez v. East Texas Motor Freight*, 405 F.2d 40 (5 Cir. 1974). Tallahassee Motors is a relatively small employer, and statistics with respect to such an employer should be regarded with caution. See *McAdory v.*

*Scientific Research Instruments, Inc.*, 355 F.Supp. 468 (D.Md.1973). Nevertheless, to the extent plaintiff's statistics may be viewed as having established a prima facie case of racial discrimination, that showing was rebutted by the evidence and testimony presented by defendant, particularly as regards the relative paucity of qualified black employees for the more skilled and higher paying jobs available at Tallahassee Motors.

4. For the foregoing reasons, the record in this case is insufficient to establish a pattern and practice of racial discrimination in the hiring or treatment of Mr. Williams or of other black employees at Tallahassee Motors. Mr. Williams, like any number of employees black and white throughout the automobile industry in late 1973-early 1974, was an unfortunate victim of economic circumstances over which neither he nor his employer had any control.

### ORDER

This cause is again before the court on plaintiff's Motion to Amend Judgment. A Memorandum Decision was entered in this case on May 13, 1976, in which the court found for defendant on both the individual and class claims.

Two of plaintiff's points assert that the court failed to take into account certain evidence presented by plaintiff in attempting to show a pattern and practice of discrimination by defendant. Both the testimony of DeVeer and the evidence regarding defendant's failure to rehire plaintiff have been considered and the court finds no fact sufficient to infer a pattern or practice of discrimination by the defendant.

Regarding the plaintiff's statistical case, clarification of Conclusion of Law number 3 is in order. As was stated there, plaintiff's statistical case is not as strong as that of other statistical cases treated by the Fifth Circuit. What constitutes "substantial" disparity is not a precise legal standard. While statistics may be used to establish a prima facie case, the statistics produced here are not so disparate a percentage as to establish a prima facie violation of Title

**4**

VII. It must be remembered that defendant is a small local employer who does not have a training program or a system of promotion; neither are tests administered or other application processes utilized. Defendant relies for its hiring on experienced people who walk in off the street. Plaintiff has not assembled any statistics regarding numbers of applicants, qualified or unqualified, black or white. Plaintiff relies solely on showing the number of blacks working for the defendant and the type of positions held, pointing to the paucity of black mechanics, salesmen and clerical workers. Several decisions have cautioned against the bare use of inextensive statistics for small companies and have required, where there was a lack of a great disparity in minority employment as compared to population, some proof beyond the statistics which would tend to show that there were blacks who had in fact applied for jobs and were qualified. *See, e. g., Keely v. Westinghouse Electric Corp.*, 404 F.Supp. 573 (E.D.Mo.1975); *Louis v. Pennsylvania Industrial Development Authority*, 371 F.Supp. 877 (E.D.Pa.1974); *affd.*, 505 F.2d 730 (3rd Cir.), *cert. denied*, 420 U.S. 993, 95 S.Ct. 1430, 43 L.Ed.2d 674 (1975); *McAdory v. Scientific Research Instruments, Inc.*, 355 F.Supp. 468 (D.Md.1973). The Fifth Circuit has stated:

> [C]omparison with general population statistics is of questionable value when we are considering positions for which, as here, the general population is not presumptively qualified. *Hester v. Southern Railway Co.*, 497 F.2d 1374, 1379 n. 6 (5 Cir. 1974).

In *Hester*, the court also stated:

> The most direct route to proof of racial discrimination in hiring is proof of disparity between the percentage of blacks among those applying for a particular position and the percentage of blacks among those hired for the position. 497 F.2d at 1379.

The court is mindful of recent Fifth Circuit decisions finding that statistical evidence established a prima facie case. However, in the factual context of this case as outlined above, the court finds that plaintiff's evidence was insufficient to make out such a case. Assuming, though, that this plaintiff's statistics were deemed sufficient alone to shift the burden, the considerations dealt with above as to defendant's business practices, along with other testimony and evidence presented by defendant regarding the relative paucity of qualified black employees, was sufficient to rebut the prima facie case.

For the foregoing reasons, the court denies plaintiff's Motion to Amend Judgment.